UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

BURTON CORTEZ,

                    Petitioner,                          Case No. 1:22-cv-225

v.                                                    Honorable Jane M. Beckering

JOHN CHRISTIANSEN,

                    Respondent.

_____/

## <u>OPINION</u>

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Burton Cortez is incarcerated with the Michigan Department of Corrections at the Earnest C. Brooks Correctional Facility (LRF) in Muskegon Heights, Muskegon County, Michigan. Petitioner pleaded guilty in the Charlevoix County Circuit Court to malicious destruction of property, in violation of Mich. Comp. Laws § 750.377a; and felonious assault, in violation of Mich. Comp. Laws § 750.82. On December 21, 2018, the court sentenced Petitioner to concurrent prison terms of 3 years, 2 months to 7 years, 6 months for malicious destruction and 1 year, 6 months to 6 years for assault.

       On March 8, 2022, Petitioner filed his habeas corpus petition raising one ground for relief, as follows:

     I.      Was Petitioner's plea rendered unknowing and involuntary where trial attorney Turkelson provided constitutionally ineffective assistance in violation of both the Sixth and Fourteenth Amendments to the U.S. Constitution.

(Pet., ECF No. 1, PageID.7.) Respondent contends that Petitioner's ground for relief is meritless.

(ECF No. 13.) For the following reasons, the Court concludes that Petitioner has failed to set forth

a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

<u>**Discussion**</u>

### I.    Factual Allegations

Petitioner had an altercation with his neighbor, Patrick Bessette, on September 14, 2018. (Plea Hr'g Tr., ECF No. 17-4, PageID.315.) At some point, Petitioner pulled out a knife and started waving it around in the direction of Pemberton, Bessette's friend. (*Id.*) Petitioner admitted that he pulled the knife and waved it around to place Pemberton in fear of "imminent or immediate battery or touching." (*Id.*) Petitioner also damaged a 1977 Ford Mustang that Pemberton had driven to the location by smashing the windows, pounding on the hood with a flashlight, and slashing the tires. (*Id.*, PageID.315–316.) Petitioner acknowledged that he had no legal justification for damaging the Mustang, and he did so because he was angry with Bessette and Pemberton. (*Id.*)

Petitioner appeared before the trial court to enter his guilty plea on November 30, 2018. At that time, Petitioner acknowledged that he had received a "full and complete opportunity" to consult with his attorney prior to the plea hearing. (*Id.*, PageID.308–309.) Petitioner acknowledged that he fully understood the plea agreement. (*Id.*) Petitioner stated that he understood his sentencing exposure, including the fact that he would be subject to being sentenced as a second-offense habitual offender. (*Id.*, PageID.311–312.) Petitioner acknowledged that no one had promised him "anything beyond the plea agreement" to induce him to plead guilty, and that no one had threatened him. (*Id.*, PageId.313–314.) Petitioner indicated that it was his "own choice to take advantage of this plea agreement." (*Id.*, PageID.314.) The trial court concluded that Petitioner's plea was "understanding, voluntary[,] and accurate," and that there was a sufficient factual basis to support the plea. (*Id.*, PageID.318.)

Petitioner appeared before the trial court for sentencing on December 21, 2018. (ECF No. 17-5.) Subsequently, Petitioner, with the assistance of new counsel, filed a motion for a *Ginther*[1] hearing and a motion to set aside his guilty plea.[2] (ECF Nos. 17-6, 17-7.) The trial court held a hearing on Petitioner's motions on December 19, 2019. (ECF No. 17-9.) At the outset of the hearing, Petitioner averred that he was moving to set aside his guilty plea on the basis that counsel "did not spend time discussing [applicable] defenses and informed [Petitioner] that he wasn't going to take this case to trial." (*Id.*, PageID.359.) Petitioner also faulted counsel for not adequately discussing the sentencing guidelines with him. (*Id.*, PageID.359–360.)

Attorney Christopher Turkelson testified during the hearing. Turkelson testified that he met with Petitioner "three or four times prior to his bond getting revoked." (*Id.*, PageID.361.) Turkelson also traveled to Petitioner's residence "because this was really a boundary line dispute" with Bessette and Pemberton. (*Id.*) Turkelson testified that he advised Petitioner of the "potential sentence for the original charge," which was "the habitual offender taking it to a life offense maximum." (*Id.*, PageID.364.) He noted further that as part of the plea agreement, the State would be dismissing one of the felonious assault charges, but that the charge would still count for purposes of sentencing. (*Id.*, PageID.364–366.) There was "no doubt" in Turkelson's mind that he had advised Petitioner that he "would be sentenced with regard to the entire factual circumstance." (*Id.*)

Turkelson testified further he "never tell[s] a client they can't go to trial. I always tell a client that's totally and completely up to them; as I did here with Mr. Cortez." (*Id.*, PageID.366.)

---

[1] *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

[2] Petitioner also filed a motion for resentencing, but that motion was withdrawn by counsel. (ECF No. 17-9, PageID.358.)

Turkelson recalled discussing that prior to the plea. He believed that Petitioner "had some real misunderstandings about a lot of things; self-defense being one of them." (*Id.*)

Turkelson testified that he discussed potential defenses with Petitioner. (*Id.*) He noted that Petitioner's "big issue was the Felonious Assault while [Petitioner] was defending [himself], . . . defending [his] family." (*Id.*, PageID.367.) Turkelson noted that his view of whether self-defense would apply was "completely different" from Petitioner's view. (*Id.*) Petitioner "was under the position, well, he felt threatened and he could just take over from there." (*Id.*) Turkelson did not agree. (*Id.*) Turkelson referenced a written statement produced by Petitioner that he was "there to protect his family." (*Id.*, PageID.373.) Petitioner "felt like he was in the right." (*Id.*) Turkelson testified that he reviewed the Institute of Continuing Legal Education (ICLE) materials regarding the various applications of self-defense. (*Id.*)

Turkelson also believed that self-defense would not apply to the destruction of the Mustang, and that even if Petitioner "[won] on the Felonious Assault charge, with the Habitual 4th on the Malicious Destruction of Property [Petitioner was] certainly facing more serious charges than [he] would otherwise be by pleading." (*Id.*, PageID.367.) Turkelson did not recall making a prediction regarding Petitioner's sentence if he took the plea offer. (*Id.*)

Turkelson noted that the plea offer was provided prior to Petitioner's preliminary examination, and that he and Petitioner discussed the offer "two or three different times." (*Id.*, PageID.368.) Turkelson testified that Petitioner never expressed that he "felt forced to enter into the plea." (*Id.*, PageID.371.) He indicated that he never told Petitioner that it was a "certainty" that he would go to prison for life. (*Id.*, PageID.371–372.) He did, however, go through the guidelines with Petitioner prior to the plea. (*Id.*, PageID.372.) Turkelson testified that he conducted

4

significant research on self-defense and that he discussed the various standards with Petitioner. (*Id.*, PageID.372–373.)

Petitioner also testified during the motion hearing. Petitioner disagreed with having multiple conversations with Turkelson, stating that he "could never contact him. Many phone calls, text messages going unanswered." (*Id.*, PageID.380.) Petitioner testified that the "only time Mr. Turkelson got a hold of us or we would talk to him is when that's what Mr. Turkelson wanted." (*Id.*) Petitioner had exhibits and video that he wanted to discuss with Turkelson but that Turkelson was "oblivious" and "did not care." (*Id.*, PageID.381.)

Petitioner testified that Turkelson would not discuss the issue of self-defense and instead told Petitioner that "it didn't matter." (*Id.*, PageID.383.) Petitioner believed that self-defense would apply because Bessette came onto what Petitioner believed was his property and threatened him. (*Id.*, PageID.385.)

Petitioner understood that by taking the plea agreement, he would not go to prison for life. (*Id.*, PageID.386.) He testified that Turkelson told him, "You either take the plea or you go to prison for life." (*Id.*, PageID.386–387.) Petitioner testified that he did not discuss the plea offer with Turkelson until the night before the guilty plea hearing. (*Id.*, PageID.387.) Petitioner indicated, however, that he never told Turkelson that he wanted to withdraw his plea prior to sentencing. (*Id.*, PageID.391.)

At the end of the hearing, the trial court orally denied Petitioner's motion, stating:

Okay. So the Motion to Withdraw Plea after Sentence would require the determination by the trial court that an error in the plea proceedings did occur that would entitle the defendant to have the plea set aside giving the defendant the benefit of—any possible doubt on this record. All I have is the fact that now the defendant is expressing that he lost confidence in his trial attorney. But that was never expressed to the Court.

And the—at this stage of the proceeding in effective assistance of counsel for—in terms of analyzing the set aside of a plea after sentencing, there's two ways that this can be done. One would be a lapsed or rejected plea offer. That's not the case.

The other issue is erroneous legal advice leading to the entry of the guilty plea. And that's not alleged either.

So for—I do—I have gone back and reviewed the plea proceedings. I did in fact— I don't find any defect in the plea proceeding that would entitle the defendant to set aside the plea. I do not find that there was any bad advice or incorrect, erroneous legal advice that was given that resulted in the defendant's guilty plea. And I do find that the defendant made a strategic decision based on, you know, correct— what appears to be, proper legal advice to avoid a potential life tail on the underlying offense as a Habitual Fourth Offender. And he limited—the plea bargain, he limited a potential tail seven and a half years.

And I also find that he was advised according to Mr. Turkelson's testimony regarding the law of self-defense. He was advised correctly on the likely sentencing guidelines range and so I don't find there's any basis for a further *Ginther* Hearing or granting the motion setting aside the plea.

So both—I mean, to the extent that I think the defendant has in this record with regard to the fact that he testified, Mr. Turkelson testified, but there will be no more hearings on this matter and the Motion [to] Set Aside the Plea is denied.

(*Id.*, PageID.434–435.) The trial court memorialized this decision in an order entered on January 22, 2020. (ECF No. 17-10.)

Petitioner subsequently sought leave to appeal to the Michigan Court of Appeals, asserting that his plea was not knowing and voluntary because of the ineffective assistance provided by Turkelson. (ECF No. 17-11, PageID.463.) In an order entered on September 10, 2020, the court of appeal denied Petitioner's delayed application for leave to appeal "for lack of merit in the grounds presented." (*Id.*, PageID.459.) On February 26, 2021, the Michigan Supreme Court denied Petitioner's application for leave to appeal. (ECF No. 17-12, PageID.813.) This § 2254 petition followed.

## II.     AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

7

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

A plea not voluntarily and intelligently made has been obtained in violation of due process and is void. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969). On the other hand, "[i]t is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984).

The test for determining a guilty plea's validity is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Courts assessing whether a defendant's plea is valid look to "all of the relevant circumstances surrounding it," *Brady v. United States*, 397 U.S. 742, 749 (1970), and may consider such factors

as whether there is evidence of factual guilt. While courts may consider whether a factual basis for a guilty plea exists in their assessments of its validity, it has generally been held that the Constitution does not require that they ensure such a basis exists. *See Higgason v. Clark*, 984 F.2d 203, 208 (7th Cir. 1993) ("'Strong evidence of guilt' may suffice to sustain a conviction on an *Alford* plea, and may be essential under Rule 11 [of the Federal Rules of Criminal Procedure], but it is not necessary to comply with the Constitution." (quoting *Alford*, 400 U.S. at 37)); *see also Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000); *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995) (citing *Higgason*, 984 F2d at 208); *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1983); *Thundershield v. Solem*, 565 F.2d 1018 (8th Cir. 1977); *Edwards v. Garrison*, 529 F.2d 1374, 1376 (4th Cir. 1975); *Roddy v. Black*, 516 F.2d 1380, 1385 (6th Cir. 1975); *Freeman v. Page*, 443 F.2d 493, 497 (10th Cir. 1971).

In order to find a constitutionally valid guilty plea, several requirements must be met. The defendant pleading guilty must be competent, *see Brady*, 397 U.S. at 756, and must have notice of the nature of the charges against him, *see Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976); *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). The plea must be entered "voluntarily," i.e., not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant" or of state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel. *Brady*, 397 U.S. at 750; *Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void."). The defendant must also understand the consequences of his plea, including the nature of the constitutional protection he is waiving. *Henderson*, 426 U.S. at 645 n.13; *Brady*, 397 U.S. at 755; *Machibroda*, 368 U.S. at 493 ("Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be

accepted unless made voluntarily after proper advice and with full understanding of the consequences." (internal quotation marks omitted) (citation omitted)).

Finally, the defendant must have available the advice of competent counsel. *Tollett v. Henderson*, 411 U.S. 258, 267–68 (1973); *Brady*, 397 U.S. at 756; *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970). The advice of competent counsel exists as a safeguard to ensure that pleas are voluntarily and intelligently made. *Cf. Henderson*, 426 U.S. at 647 ("[I]t may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."); *Brady*, 397 U.S. at 754 (suggesting that coercive actions on the part of the state could be dissipated by counsel). Ineffective assistance of counsel will render a plea of guilty involuntary. *See Hill*, 474 U.S. at 56–57.

Petitioner's ground for relief implicates the last requirement, as he contends that Turkelson provided ineffective assistance during plea proceedings. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court

must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (citing *Harrington*, 562 U.S. at 102) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ").[3]

The two-part *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill*, 474 U.S. at 58. Regarding the first prong, the court applies the same standard articulated in *Strickland* for determining whether counsel's performance fell below an objective standard of reasonableness. *Id.* In analyzing the prejudice prong, the focus is on whether counsel's constitutionally deficient performance affected the outcome of the plea process. "[I]n

---

[3] The Michigan Court of Appeals issued only a summary affirmance, denying the appeal for lack of merit in the grounds presented. That affirmance, however, is deemed a decision on the merits of the claims presented that is entitled to AEDPA deference. *See Harrington*, 562 U.S. at 99; *see also Johnson*, 568 U.S. at 298; *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).

order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*. at 59.

Not every ineffective assistance of counsel claim survives a guilty plea. Claims about the deprivation of constitutional rights that occur before the entry of a guilty plea are foreclosed by that plea. *See United States v. Broce*, 488 U.S. 563, 569 (1989); *Tollett*, 411 U.S. at 267. The United States Supreme Court has explained:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [constitutional standards].

*Tollett*, 411 U.S. at 267. Consequently, a knowing and voluntary guilty plea waives all nonjurisdictional defects in the proceedings, including a claim of ineffective assistance of counsel that does not relate to the voluntariness of the plea. *See United States v. Stiger*, 20 F. App'x 307, 308–09 (6th Cir. 2001).

## A.    Advice Regarding Sentencing Guidelines

Petitioner first contends that trial counsel rendered ineffective assistance by failing to properly advise Petitioner regarding the applicable sentencing guidelines should Petitioner go to trial and be convicted. (ECF No. 2, PageID.32.) According to Petitioner, he would have chosen to go to trial "but for the inaccurate belief that a life sentence would result." (*Id.*) Petitioner argues that Turkelson should have advised him that the law "essentially requires a minimum term within or close to the minimum term advised by the Legislative Sentencing Guidelines instead of continually informing him that the potential sentence was life." (*Id.*, PageID.35.) Petitioner

essentially appears to suggest that counsel coerced him into taking the plea by repeatedly insisting that Petitioner would be sentenced to life should he go to trial and be convicted.

When a state defendant brings a federal habeas petition challenging the voluntariness of his plea, the state generally satisfies its burden of showing a voluntary and intelligent plea by producing a transcript of the state court proceeding. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993); *see also McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Garcia*, 991 F.3d at 326). Where the transcript is adequate to show that the plea was voluntary and intelligent, a presumption of correctness attaches to the state court findings of fact and to the judgment itself. *Id.* A satisfactory state court transcript, containing findings after a proper plea colloquy, places upon petitioner a "heavy burden" to overturn the state findings. *Id.* at 328; *see also Parke v. Raley*, 506 U.S. 20, 29 (1992) (holding that the factual findings of voluntariness made by the state court are entitled to a presumption of correctness); *Blackledge v. Allison*, 431 U.S. 63, 73 (1977) (finding that a solemn plea of guilty presents a "formidable barrier" to a subsequent claim to the contrary).

Here, the State has not only produced a transcript of Petitioner's guilty plea proceedings but has also produced a transcript of the hearing held regarding Petitioner's motion to set aside his guilty plea. During the plea hearing, Petitioner testified that he understood that by pleading guilty, he faced a maximum of seven and a half years of incarceration with respect to the felonious assault charge and six years of incarceration with respect to the malicious destruction of property charge because of the application of the second-offense habitual offender enhancement. (Plea Hr'g Tr., ECF No. 17-4, PageID.311–312.)

During the hearing regarding Petitioner's motion to set aside his plea, Turkelson testified that he advised Petitioner that the application of the habitual offender enhancement to the original charges, would "tak[e] it to a life offense maximum." (ECF No. 17-9, PageID.364.) He noted

14

further that as part of the plea agreement, the State would be dismissing one of the felonious assault charges, but that the charge would still count for purposes of sentencing. (*Id.*, PageID.364–366.) There was "no doubt" in Turkelson's mind that he had advised Petitioner that he "would be sentenced with regard to the entire factual circumstance." (*Id.*) Turkelson testified that he never told Petitioner that it was a "certainty" that he would go to prison for life if he were convicted at trial. (*Id.*, PageID.371–372.) He did, however, go through the guidelines with Petitioner prior to the plea. (*Id.*, PageID.372.)

Although Petitioner testified at the motion hearing that Turkelson told him, "You either take the plea or you go to prison for life" (*id.*, PageID.386–387), he also testified that he understood that the possibility of life imprisonment would be taken off the table should he plead guilty (*id.*, PageID.386). By denying Petitioner's motion to set aside his guilty plea, the trial court credited Turkelson's testimony over that given by Petitioner, concluding that Petitioner was not given any erroneous legal advice and that he made a "strategic decision" based upon "proper legal advice to avoid a potential life tail on the underlying offense as a Habitual Fourth Offender." (*Id.*, PageID.435.)

In his § 2254 petition, Petitioner merely reiterates his assertions regarding Turkelson's alleged incorrect advice regarding the sentencing guidelines—assertions that have already been rejected by the state courts following a thorough evidentiary hearing. Even if Turkelson emphasized that Petitioner could avoid the possibility of life imprisonment by pleading guilty, informing Petitioner of that possibility "is not coercive." *Williams v. United States*, 47 F. App'x 363, 370 (6th Cir. 2002); *see also United States v. Green*, 388 F.3d 918, 923 (6th Cir. 2004) ("[A]ccurate information regarding the possible ramifications of proceeding to trial cannot be construed as coercive"). Petitioner wholly fails to rebut the trial court's factual finding regarding

15

Turkelson's advice about Petitioner's sentencing exposure by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Davis*, 658 F.3d at 531; *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Petitioner simply has not demonstrated that Turkelson's performance with regard to the potential life sentence was professionally unreasonable. Petitioner, therefore, fails to show that the state court's rejection of this portion of his ineffective assistance claim was contrary to, or an unreasonable application of, clearly established federal law.

### B.      Advice Regarding Self-Defense and Defense of Others

Next, Petitioner faults Turkelson for providing ineffective assistance by "fail[ing] to familiarize himself with the law of self-defense in Michigan." (ECF No. 2, PageID.35.) Petitioner argues that he "made a statement to police that the alleged victim came onto his property and used his car to run over 2 people and almost hit a 3rd, at that time Petitioner cut the tires to disable the vehicle and then attempted to remove the driver to ensure he could no longer use his vehicle as a weapon." (*Id.*, PageID.36.) According to Petitioner, all witnesses and evidence "supported his position that he was defending himself and others present." (*Id.*) According to Petitioner, he would have proceeded to trial "but for Attorney Turkelson's errors." (*Id.*, PageID.35.)

Petitioner attached a copy of the statement he references to his brief supporting his § 2254 petition. (ECF No. 2-3.) In that statement, Petitioner wrote that the altercation with Bessette started when Bessette told Petitioner and his wife to get "the f*** off his property." (*Id.*, PageID.46.) Petitioner's wife told Bessette that she had "lived here since '89' and started to point out how the lines were r[un] for the property." (*Id.*) Bessette then recognized Petitioner and called him "the tree jumper that raped 2 15 year old girls." (*Id.*, PageID.47.) Petitioner wrote that he "got pissed and snatched [his] shirt off" because he was "ready to scrap it out." (*Id.*) Bessette said, "you want problems, I'll give you problems," turned around, and walked "back up over the hill onto his land." (*Id.*) Petitioner continued to yell at Bessette, calling him "a bitch and a coward." (*Id.*) By that time,

16

Petitioner's friend, cousins, and stepdaughter had joined them. (*Id.*, PageID.48.) According to Petitioner, Bessette yelled, "Don't go to sleep [tonight]" and continued walking up the hill to his house. (*Id.*)

Petitioner wrote that when it got darker, he got his mag light so that he could see if needed, and he saw Bessette "standing on our property again talking shit." (*Id.*, PageID.49.) Petitioner yelled, "Hey bitch, where's your friends" and started walking toward Bessette. (*Id.*) Petitioner then heard a car start and saw headlights "pointed out over [his] head." (*Id.*) Petitioner wrote that he was on his property with his cousins and friend, and that the car was coming towards them. (*Id.*, PageID.50.) Petitioner told Bessette that he was on their property. (*Id.*) According to Petitioner, Bessette "ran up the hill and left his buddy in the car to fend for himself." (*Id.*)

Petitioner wrote that Bessette's friend, Pemberton, was driving the Mustang, and Petitioner asked "what he was gonna do." (*Id.*) By that time, the car had stopped, and Pemberton was standing behind the open door. (*Id.*) Petitioner took his flashlight and "smacked the hood of [the] car." (*Id.*) According to Petitioner, Pemberton said "f*** off," jumped in the car, closed the door, and "gunned" the car at Petitioner. (*Id.*, PageID.51.) Petitioner "got clipped by the front bumper which knocked [him] off balance." (*Id.*) He saw Pemberton "[get] down by the gully and [try] to turn a 180° to go back up the hill" when the car hit Petitioner's one cousin. (*Id.*) Petitioner then pulled his Gerber knife from his belt and slashed the Mustang's tires. (*Id.*) Pemberton got out of the car, and it sat there running with the door open and lights on for 10 to 15 minutes. (*Id.*, PageID.52.) Petitioner wrote that during that time, he and others were smashing the windows and the body of the car with wrenches and a flashlight. (*Id.*) Petitioner then got in his SUV and started using it to push the Mustang up the hill toward Bessette's property. (*Id.*)

17

Petitioner wrote his statement after he was arrested. (ECF No. 17-3, PageID.264.) The State attached a copy of that statement to its motion to amend Petitioner's bond. (*Id.*, PageID.264.) Turkelson represented that he received a copy of the statement on October 4, 2018, five days before Petitioner's preliminary examination. (*Id.*, PageID.265.) Turkelson, therefore, had Petitioner's written version of events at the time plea negotiations and discussions occurred. As noted above, Petitioner faults Turkelson for not fully researching and advising him on self-defense and defense of others. Petitioner contends that had Turkelson adequately researched and advised him on those affirmative defenses, he would not have taken the plea and would have proceeded to trial.

In Michigan, "[a]n affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" *People v. Reese*, 815 N.W.2d 85, 101 n.76 (Mich. 2012) (quoting *People v. Dupree*, 788 N.W.2d 399, 405 (Mich. 2010)).  The State of Michigan has always recognized the common law affirmative defense of self-defense as a justification for the commission of certain criminal acts. On October 1, 2006, however, the State of Michigan gave effect to the self-defense act (SDA), Mich. Comp. Laws §§ 780.971–780.974, which modified the common law defense in the following provisions:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> > (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
> >
> > (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.
>
> (2) An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if he or she honestly and reasonably believes that the use of that

18

force is necessary to defend himself or herself or another individual from the
imminent unlawful use of force by another individual.

Mich. Comp. Laws § 780.972. The SDA's modification of the common law defense goes no

further than the words quoted above. *See* Mich. Comp. Laws § 780.973 ("Except as provided in

[§ 780.972], this act does not modify the common law of this state in existence on October 1, 2006

regarding the duty to retreat before using deadly force or force other than deadly force."); Mich.

Comp. Laws § 780.974 ("This act does not diminish an individual's right to use deadly force or

force other than deadly force in self-defense or defense of another individual as provided by the

common law of this state in existence on October 1, 2006.").

Petitioner also suggests that he was defending his family and friends during the incident.

"Under the defense-of-others doctrine, '[o]ne may use force in defense of another when he or she

reasonably believes the other is in immediate danger of harm and force is necessary to prevent the

harm; deadly force is permissible to repel an attack which reasonably appears deadly.'" *People v.*

*Leffew*, 975 N.W.2d 896, 904 (Mich. 2022) (quoting 3A Gillespie, Michigan Criminal Law &

Procedure (2d ed.), § 91:59, p.399). As the *Leffew* court noted, the "defense-of-others doctrine has

deep roots in Michigan jurisprudence." *Id.* (collecting cases).

It appears that Petitioner suggests that self-defense and defense of others would have both

applied to justify his felonious assault and malicious destruction of property charges. Petitioner

avers that counsel never investigated "Michigan's stand your ground law," which the Court has

set forth above. (ECF No. 2, PageID.35.) Turkelson had Petitioner's written version of events as

of October 4, 2018. During the *Ginther* hearing, Turkelson testified that Petitioner "brought up

any self-defense initially . . . and that's why [Turkelson] went out to [Petitioner's] residence."

(ECF No. 17-9, PageID.372.) He referenced Petitioner's written statement that he was "there to

protect his family." (*Id.*, PageID.373.) Petitioner "felt like he was in the right." (*Id.*) Turkelson

testified that he reviewed the ICLE materials regarding the various applications of self-defense. (*Id.*) Turkelson testified that he told Petitioner that self-defense "was a real stretch and that would probably be a real stretch at trial based [on] his written statement." (*Id.*, PageID.374–375.) The trial court credited Turkelson's testimony, concluding that he advised Petitioner "regarding the law of self-defense." (*Id.*, PageID.435.)

Petitioner's references to "standing his ground" suggest that Petitioner believed he had a legal right to be on the property where the altercation occurred and that he reasonably believed force was necessary to defend himself and his family. *See* Mich. Comp. Laws § 780.972(2). However, during the hearing regarding the State's motion to amend Petitioner's bond, Turkelson referenced "a real dispute where the property line still is." (ECF No. 17-3, PageID.269.) During the *Ginther* hearing, Turkelson again stated that the case essentially boiled down to "a boundary line dispute" between Petitioner and Bessette. (ECF No. 17-9, PageID.361.) Given the uncertainty of the property line, there was a question of whether Petitioner had a legal right to be on the property where the altercation occurred.

Perhaps a charitable jury might have concluded that Petitioner's brandishing of the knife— the felonious assault—was justified by his claim of defense of others. But that victory would have been small consolation if self-defense would not have justified the entirety of Petitioner's criminal conduct with which Petitioner was charged.

At the time of Petitioner's guilty plea, the Michigan courts had not clearly established whether self-defense and defense of others applied to justify nonassaultive property crimes. Instead, the state courts had only considered the question with respect to firearms charges and home invasion. *See, e.g.*, *People v. Triplett*, 878 N.W.2d 811, 814–15 (Mich. 2016) (concluding that the defendant should have been permitted to claim self-defense as a justification for the

nonassaultive crime of carrying a concealed weapon); *Dupree*, 788 N.W.2d at 705–06 (concluding that self-defense is applicable to a non-assaultive felon-in-possession charge); *People v. Goree*, 819 N.W.2d 82, 89 (Mich. Ct. App. 2012) (concluding that the trial court erred by instructing the jury that self-defense did not apply to the possessory, nonassaultive felony-firearm charge); *People v. Miller*, No. 276589, 2008 WL 2312719, at *4 (Mich. Ct. App. June 5, 2008) (concluding, in a home-invasion case, that the [d]efendant's testimony presented some facts to support a defense of others instruction," but that counsel's failure to request such an instruction was not prejudicial); *People v. Torrez*, No. 274582, 2008 WL 1829559, at *1–2 (Mich. Ct. App. Apr. 24, 2008) (extending the defense-of-others defense to home-invasion prosecutions when assault is used to establish an element of the offense).

In 2020, the Michigan Court of Appeals noted that, "[g]enerally, the defense-of-others defense is used to excuse assaultive conduct, i.e, the use of force directly against a person." *People v. Leffew*, Nos. 343818, 344240, 2020 WL 1816002, at *3 (Mich. Ct. App. Apr. 9, 2020). The court of appeals concluded that the defendants did not provide persuasive authority that the defense applied to excuse the home invasion at issue—which was based on a misdemeanor malicious destruction of a building under $200—and, therefore, counsel was not ineffective for failing to request a defense-of-others instruction at trial. *Id.* at *3–4. The Michigan Supreme Court subsequently reversed that conclusion, noting that "*generally* is not *always* true, and Michigan and sister jurisdictions recognize both self-defense and defense of others as justifications for nonassaultive crimes." *Leffew*, 975 N.W.2d at 905 (collecting cases). The court concluded it would not have been "novel" for the defendants' attorneys to request a defense-of-others instruction and that counsel's failure to do so rose to the level of ineffective assistance. *Id.* at 905–913. Thus, the

*Leffew* decision provides some support for the theory that self-defense and defense of others can apply to justify a malicious destruction of property charge.

Clearly, *Leffew* was issued well after Petitioner had entered his guilty plea, and counsel cannot be ineffective for failing to anticipate a rule of law not yet articulated by the governing courts. *See O'Neil v. United States*, 966 F.3d 764, 774 (8th Cir. 2020) (citing *Basham v. United States*, 811 F.3d 1026, 1029 (8th Cir. 2016)); *cf. New v. United States*, 652 F.3d 949, 952 (8th Cir. 2011) ("A failure to raise arguments that require the resolution of unsettled legal questions generally does not render a lawyer's services 'outside the wide range of professionally competent assistance' sufficient to satisfy the Sixth Amendment.") (quoting *Strickland*, 466 U.S. at 690).

But even if the reasoning set forth in *Triplett*, *Dupree*, *Goree*, *Miller*, and *Torrez* warranted consideration of self-defense as a justification for the malicious destruction of property at the time of Petitioner's guilty plea, Petitioner has not demonstrated that counsel was ineffective for failing to suggest that Petitioner pursue those defenses at trial in lieu of a plea. Petitioner's own written statement indicates that he and his associates destroyed the vehicle ***after*** it was stopped, and driverless. No one at the scene was in immediate danger of harm from the vehicle at that time. For counsel to advise Petitioner to rely on self-defense and risk a life sentence under those circumstances would have been professionally unreasonable. Certainly, Petitioner has not demonstrated that Turkelson's advice regarding self-defense and defense of others was professionally unreasonable.

In sum, Petitioner has not demonstrated that Turkelson rendered ineffective assistance of counsel such that Petitioner's guilty plea was rendered unknowing and involuntary. Petitioner, therefore, is not entitled to habeas relief for the reasons set forth above.

### IV.      Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **<u>Conclusion</u>**

The Court will enter a judgment denying the petition, as well as an order denying a certificate of appealability.


Dated:      October 27, 2023                            /s/ Jane M. Beckering
                                             Jane M. Beckering
                                             United States District Judge